JOHNSON, J.,
dissents and assigns reasons.
hi dissent from the majority’s determination that the defendant physician, Dr. Khaled F. Rabie, is entitled to summary judgment. Defendant’s main contention is that Plaintiff cannot prevail because she has no expert witness, and that she will not sustain her burden of proof without expert medical testimony. Dr. Rabie relies on the opinion of the Medical Review Panel as evidence in support of his motion for summary judgment where the panel stated, “It is unfortunate that when Dr. Rabie first examined the patient, (at 6:55 a.m.) the baby was probably already dead, as determined by the absence of fetal cardiac activity on ultrasound exam.”
This conclusion is rebutted by the hospital medical records which document the infant’s heartbeat was detected when Dr. Rabie examined the patient at 7:13 a.m. This conflicting evidence presents a factual dispute which could lead a reasonable jury to conclude that the baby was not dead at 6:55 a.m. Expert testimony would not be required to explain to a jury that a living infant has a heartbeat, while a deceased infant does not.
In medical malpractice claims, Louisiana jurisprudence has recognized that |2there are situations where expert testimony is not necessary. The leading case addressing this issue is Pfiffner v. Coma, 94-0924 (La.10/17/94), 643 So.2d 1228. In Pfiffner, we concluded that expert testimony is not always required to defeat a defendant’s motion for summary judgment in a medical malpractice case.
We hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794’s requirements without medical experts, there are instances in which the medical and factual *1011 issues are such that a lay jury can perceive negligence in the charged physician’s conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care, and there is objective evidence, including the testimony of the defendant/physician which demonstrates a breach thereof. Even so, the plaintiff must also demonstrate by a preponderance of the evidence a causal nexus between the defendant’s fault and the injury alleged.
The Pfiffner court held that obvious negligence may be inferred by a lay person from “[fjailure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary....” Pfiffner, 94-0992, 643 So.2d 1228 (La.1994). The facts of this case fit squarely within this definition of obvious negligence which may be inferred by a lay person.
This teenaged patient arrived at Oak-dale Community Hospital’s Emergency Room at 4:00 a.m., in labor, with contractions occurring every three to four minutes. At 4:08 a.m., her membranes ruptured and a large quantity of yellow fluid was noted, followed by a small amount of bright red blood. She was evaluated by the ER physician, Dr. Chaftari, at 4:22 a.m., who performed a pelvic examination which revealed that Ms. Brow’s cervix was dilated 3 to 4 cm. Fetal heart tones were approximately 143 beats per minute. An ultrasound was performed and the uterine |3size indicated she was 28.4 weeks pregnant. Dr. James Guoth was notified at home of Ms. Brow’s condition, and he recommended that Ms. Brow be transferred to Rapides Women’s and Children’s Hospital (RWCH) because that hospital had a level three nursery and could provide a higher level of neonatal care, and deliver a baby who was in a breech presentation.
When Ms. Brow arrived at RWCH at 6:29 a.m., this was obviously a medical emergency. According to Dr. Rabie, he arrived at the hospital at 6:55 a.m., performed an ultrasound at the patient’s bedside at 7:00 a.m., and was unable to detect any fetal heart tones or fetal heart activity. Yet, at 7:13 a.m., when he applied a Fetal Scalp Electrode (FSE) to the exposed part of the baby, a fetal heart rate fluctuating from 60-144 beats per minute was found. At that point, Dr. Rabie declared the medical emergency and ordered a Caesarean section at 7:14 a.m., which was performed at 7:25 a.m. At 7:33 a.m., Dr. Rabie delivered a stillborn infant with no audible heartbeat, no palpable heart rate, and no respiratory effort.
In my view, the medical providers breached the standard of care with regard to this young mother and her baby. With a three hour window, there was adequate time to deliver this baby. A jury should be allowed to determine: (1) whether Dr. Rabie appeared at the hospital timely, in response to Ms. Brow’s labor, (2) whether Dr. Rabie’s delay in performing the Cesarean . section was unreasonable, and (3) whether his delay caused the death of the plaintiffs unborn child or deceased the infant’s chance of survival.